IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CHARLES CLENDENIN, REPRESENTATIVE OF THE ESTATE OF WILLIAM CLENDENIN,<br><br>    *Plaintiff*,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    *Defendant*. | Case No. 1:19-cv-889<br><br>Judge Jeffery P. Hopkins |

**OPINION AND ORDER**

This case arises from the tragic death of Private First-Class William Clendenin ("William"). The Complaint alleges that William died by suicide caused by acute fentanyl intoxication. Prior to his death, William had been under the care of the Cincinnati Veterans Affairs Medical Center ("CINVAMC") following an injury that prompted his honorable discharge from military service. His father, Charles Clendenin ("Plaintiff"), brings this action against the United States of America ("Defendant") under the Federal Tort Claims Act ("FTCA") alleging that medical malpractice by CINVAMC caused William's death.

This matter is now before the Court on Defendant's Motion for Summary Judgment (Doc. 34), Plaintiff's Opposing Memorandum (Doc. 38), and Defendant's Reply (Doc. 41). Also before the Court is Defendant's Motion to Exclude a note written by William ("Decedent Note") that Plaintiff relied upon in his Opposing Memorandum. Doc. 43.[1]

---

[1] In his Opposing Memorandum to the Motion for Summary Judgment (Doc. 38), Plaintiff relied on the Decedent Note which states: "Break Point GODs GOT MY BAAC [sic] from here on out . . ." Doc. 37-4,

Here, the Court must decide whether health care providers at CINVAMC breached the standard of care by failing to properly manage William's medical records, proscribing for him Cognitive Processing Therapy ("CPT") to treat his Post-Traumatic Stress Disorder ("PTSD"), and failing to diagnose his PTSD symptoms during a visit to the emergency room. Defendant contends that Plaintiff cannot establish that a breach occurred because Plaintiff failed to meet his burden of showing the applicable standard of care. As explained more fully below, the Court agrees. Accordingly, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 34).[2] Because the Court reaches this conclusion without relying on the Decedent Note, it need not reach Defendant's Motion to Exclude (Doc. 43), which is **DENIED AS MOOT**.

---

PageID 1001. Defendant argued in its Reply (Doc. 41) that the Decedent Note is inadmissible and cannot be relied upon in the Court's adjudication of the Motion for Summary Judgment. The Court requested additional briefing on whether the Decedent Note is admissible for purposes of ruling on the Motion for Summary Judgment (Doc. 42) and the parties fully briefed that issue (Docs. 43, 45, 47). In its supplemental briefing, Defendant, among other things, moved to exclude the Decedent Note. Doc. 43.

[2] At the time the Motions were filed, this case was assigned to the Honorable Matthew W. McFarland. Judge McFarland's Standing Order requires summary judgment movants to attach proposed undisputed facts setting forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. Every brief in opposition to a motion for summary judgment must attach a response to the movant's proposed undisputed facts, which states, in separately numbered paragraphs corresponding to the proposed undisputed facts, whether each of the facts asserted by the moving party is admitted or denied. Each statement of material fact or response thereto "must be followed by a specific citation or citations to (1) the affidavit of a witness competent to testify as to the facts at trial, (2) a sworn deposition, and/or (3) other evidence, including documentary evidence, that would be admissible at trial." Standing Order § B.1; *see also* Fed. R. Civ. P. 56(c).

Defendant attached proposed undisputed facts to its Motion for Summary Judgment. Doc. 34-1. Plaintiff's response to Defendant's proposed undisputed facts is not compliant with the Standing Order's requirements; both Plaintiff's denial of the "findings or conclusions" in certain numbered paragraphs of Defendant's Proposed Undisputed Facts and his blanket denial of "[t]he remainder of the 106 undisputed facts in Defendant's Proposed Undisputed Facts" are without any citation to the record. Doc. 38-1. In reviewing the record, the Court will disregard any such unsupported factual denials asserted by Defendant. *See Parsons v. FedEx Corp.*, 360 F. App'x 642, 646 (6th Cir. 2010) ("A district court has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment.") (citations omitted).

2

I.       BACKGROUND

    A. William Clendenin's Motor Vehicle Accident.

William Clendenin served honorably in the United States Army National Guard. Doc. 33-4, PageID 238. In 2003, he was called up to active duty to assist with the United States' military effort in Iraq and in preparation trained at Fort McCoy, Wisconsin. Doc. 33-3, PageID 163. However, the day before his unit was deployed, William was seriously injured in a motor vehicle accident, preventing him from being deployed with his unit. *Id.* at PageID 163–64; Doc. 33-4, PageID 233. Eventually, William was honorably discharged from the Army National Guard because of the neck, back, ankle, and foot injuries he sustained in the accident. Doc. 33-4 at PageID 233, 246–47, 278.

    B. William Clendenin's Care at CINVAMC.

CINVAMC treated William from 2004 to 2016. *Id.* at PageID 233–385. CINVAMC providers diagnosed him with PTSD and gave him psychological care for that diagnosis, among others. *Id.* at PageID 235, 240, 242, 254, 257, 279, 282, 288, 293–95, 307–308, 313, 327.

In December 2010, William received education on the different types of PTSD treatments and began trauma-focused CPT under the care of CINVAMC providers. *Id.* at PageID 266–273. In March 2011, William told a suicide prevention coordinator he had no plans to return for more CPT treatment because it made him feel miserable. *Id.* at PageID 280.

CINVAMC providers also diagnosed William with a substance use disorder ("SUD"). *Id.* at PageID 254. He participated in individual therapy for SUD at CINVAMC as well as

group therapy, including Alcoholics Anonymous and Narcotics Anonymous programs. *Id.* at PageID 252, 317, 338, 357.

As of 2015, William was flagged as a high risk for suicide based on at least five previous suicide attempts. *Id.* at PageID 271. His suicidality fluctuated over time; he endorsed suicidal thoughts and plans at times and denied them at other times. *Id.* at PageID 270–72, 286–89, 300–05, 314, 356.

### i. William Clendenin's Participation in the Study.

In February 2016, William was admitted to a residential treatment program in Fort Thomas, Kentucky, under the care of CINVAMC. Doc. 33-4, PageID 351. In April 2016, Dr. Laura Gilliam, Ph.D., contacted William to ask him if he would like to participate in a PTSD research study (the "Study") designed to compare the effectiveness of two types of individual therapies for the symptoms of PTSD, Prolonged Exposure ("PE") versus CPT. *Id.* at PageID 333–34. On May 4, 2016, William was deemed eligible to take part in the Study and signed a consent form to participate in the Study. *Id.* at PageID 341–44. After he was assigned to the Study, William received CPT instead of PE therapy to assist with resolving his PTSD symptoms. *Id.* at PageID 346.

William participated in eleven sessions of CPT between June 15, 2016 and September 1, 2016. *Id.* at 363–65. Progress occurred. On September 1, 2016, at William's final session of the Study, he showed clinically significant decreases in PTSD and depressive symptoms. *Id.* at PageID 364. He also reported increased comfort when driving and reduced reactivity to stressors. *Id.* at PageID 365.

On September 12, 2016, CINVAMC providers completed a psychological therapy session with William and noted that his mood was "good, much better." *Id.* at PageID 369.

4

In late 2016, William was discharged from the residential treatment program and returned to live with his parents in Ohio. *Id.* at PageID 368, 370.

On November 15, 2016, William told a CINVAMC provider that he had experienced a period of increased cravings for opioids since he left the residential treatment program but that he had held off misuse of these drugs. *Id.* at PageID 370.

### ii. William Clendenin's ER Visit.

On December 2, 2016, William presented to the CINVAMC ER with a history of four weeks of substernal chest pressure (the "ER Visit"). Doc. 33-4, PageID 373–74. A CINVAMC provider evaluated William; he received a chest x-ray, EKG, lab work, electrolytes test and a urinalysis, and all were negative for any problems. *Id.* at PageID 370–79. William was discharged in stable condition with instructions to follow up with his primary care provider. *Id.* at PageID 379.

Five days later, William attended an individual therapy session with a CINVAMC provider where he reported that he was doing well and staying clean and sober and denied suicidal and homicidal ideation. *Id.* at PageID 380.

### C. Willaim Clendenin's Death.

On December 8, 2016, William attended a three-month follow up assessment with Dr. Gilliam as a part of the Study. Doc. 33-4, PageID 381. Dr. Gilliam noted that William completed the Study procedures per its protocol and tolerated all the procedures well and without any complications and that he was not reporting suicidal ideation, plan, or intent. *Id.* William was scheduled for an additional telephonic follow-up assessment for the Study on December 14, 2016. *Id.*

William was last seen at the CINVAMC on December 15, 2016, at the optometry clinic during which he received a prescription for new glasses. *Id.* at PageID 382. Tragically, the next day, Plaintiff found William dead in his bedroom at their home. Doc. 33-10, PageID 819. A toxicology report found fentanyl in his system. Doc. 33-12, PageID 830. Both the Clermont County and Hamilton County Coroners concluded that William died of acute fentanyl intoxication. Doc. 33-11, PageID 826; Doc. 33-13, PageID 831.

## II. MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

As the party seeking summary judgment, Defendant "'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The non-moving party, here, Plaintiff, cannot defeat summary judgment merely by pointing to any factual dispute. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket and emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

After reviewing the evidence before it, the Court must determine whether there is some "sufficient disagreement" about material facts that demands submitting the matter to a jury.

*Moore v. Philip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "[i]n arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party," here, Plaintiff. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

### B. LAW AND ANALYSIS

Plaintiff has asserted a claim for medical malpractice against Defendant under the FTCA, alleging that CINVAMC breached their standard of care by (1) failing to file, maintain, and access William's medical records; (2) improperly providing CPT to him through the Study; and (3) failing to diagnose his PTSD symptoms during the ER Visit.

The FTCA sets forth the circumstances by which the United States can be held liable for torts "in the same manner and to the same extent as a private individual." 28 U.S.C. § 2674. In cases of alleged malpractice by government medical professionals, "[l]iability under the [FTCA] is determined by reference to the law of the state where the alleged medical malpractice or negligence occurred." *Lyons v. Brandly*, 430 F. App'x 377, 381 (6th Cir. 2011). The parties agree Ohio law applies here.[3]

---

[3] In this case, William's alleged improper CPT sessions occurred in Kentucky, but at least one alleged negligent act occurred in Ohio during William's ER Visit when Plaintiff contends CINVAMC providers failed to diagnose his PTSD symptoms. Under the FTCA, district courts should apply the whole law, including the choice-of-law rules, of the state where the negligent act or omission occurred. *See Richards v. United States*, 369 U.S. 1, 10–11 (1962). When determining which state's choice of law provision applies in cases involving multiple acts or omissions occurring in different states, courts perform a conflict of laws analysis. *Raflo v. United States*, 157 F. Supp. 2d 1, 8 (D.D.C. 2001) (citing *Gould Electronics Inc. v. United States*, 220 F.3d 169, 180 (3d Cir. 2000)). Before proceeding to a conflict of law analysis, "the court must determine whether the perceived conflict between the underlying choice of law rules or between the underlying substantive laws is, in fact, a 'true conflict.'" *Id.* at 8 (quoting *Gould*, 220 F.3d at 180). Both Ohio and Kentucky require the same essential elements for a medical malpractice claim and both states generally require expert testimony to

To prove medical malpractice in Ohio, a plaintiff must establish the following elements: "(1) the applicable standard of medical care; (2) defendant's negligent failure to meet that standard; and (3) that the defendant's negligence proximately caused the plaintiff's injury." *Rodriguez v. United States*, No. 1:14-CV-02526, 2015 WL 5444804, at *2 (N.D. Ohio Sept. 15, 2015) (citing *Bruni v. Tatsumi*, 46 Ohio St. 2d 127 (1976)).

Someone wanting to prove medical malpractice in Ohio must also establish "by a preponderance of the evidence and generally through expert testimony, that the defendant medical providers failed to adhere to the appropriate standard of care recognized by the relevant medical community and that such failure caused the plaintiff injury." *Lyons*, 430 F. App'x at 380; *see also Bruni*, 46 Ohio St. 2d at 131–32 ("Proof of the recognized standards must necessarily be provided through expert testimony."). Standard of care is defined "as the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations." *Bruni*, 46 Ohio St. 2d at 130. Failure to establish the standard of care is fatal to a prima facie case of medical malpractice. *Id.* at 131.

Plaintiff relies on the reports[4] of psychologist Louise Gaston, Ph.D., to establish the standard of care applicable to CINVAMC, CINVAMC's breach of that standard, and that

---

establish each element. *See Bruni v. Tatsumi*, 46 Ohio St. 2d 127, 131 (1976) (medical malpractice requires a plaintiff to establish (1) the applicable standard of care within the medical community, (2) the defendant breached that standard of care, and (3) the breach of the standard of care proximately caused the plaintiff's injury); *Blankenship v. Collier*, 302 S.W.3d 665, 675 (Ky. 2010) (medical malpractice requires a plaintiff to establish (1) the applicable medical standard of care, (2) a breach of that care, and (3) an injury resulting from that breach of care). Since both parties apply Ohio law in their briefs and there is no conflict of law between Ohio and Kentucky as to the standard for a medical malpractice claim, the Court need not perform a conflict of laws analysis.

[4] Plaintiff relies on two reports by Dr. Gaston: (1) a June 21, 2021 report titled "Independent Psychological Opinion- Second Edition"; and (2) a November 19, 2021 opinion rebutting Defendant's experts. Docs. 37-5, 37-6. Defendant argues that the June 1, 2021 report opinion should be excluded because Plaintiff failed to timely disclose it by the deadline of December 2, 2020, thereby triggering Rule 37's automatic exclusion provision. Doc. 34, PageID 837. The Court need not resolve this issue here because, even considering the June 1, 2021 report, Plaintiff's claim fails for the reasons discussed herein.

CINVAMC's breach caused William's death. Defendant argues, among other things, that Dr. Gaston's reports fail to establish the applicable standard of care.

### i. Dr. Gaston's reports do not establish the applicable standard of care for CINVAMC's recordkeeping or ER procedures.

Plaintiff alleges that CINVAMC breached their standard of care by failing to file, maintain, and access William's medical records and failing to diagnose his PTSD symptoms during the ER Visit. But neither of Dr. Gaston's reports address the standard of care applicable to CINVAMC's recordkeeping or its diagnoses during William's ER Visit. Nor do her reports opine on any causal link between these alleged breaches and William's death. As such, neither alleged breach can serve as a proper basis for Plaintiff's medical malpractice claim.

### ii. Dr. Gaston's reports do not establish the applicable standard of care for CINVAMC's provision of CPT to William Clendenin.

As to CINVAMC's treatment of William's PTSD with CPT through the Study, Dr. Gaston acknowledges that CINVAMC providers "seem[] to have followed VA guidelines which are based on research conclusions drawn by enthusiastic researchers[]" but asserts that "*[i]n my opinion*, providing CPT to William Clendenin involved a disregard of the first ethical principle of the American Psychological Association[.]" Doc 37-5, PageID 1002 (emphasis added). That principle, according to Dr. Gaston, is the ethical principle of "Beneficence and Nonmaleficence" which provides that "[p]sychologists strive to benefit those with whom they work and take care to do no harm."[5] *Id.* Based on this principle, she opines that CINVAMC

---

[5] In support her reliance on the "do no harm" principle, Dr. Gaston also contends that "[t]here is no 'standard of care' for the treatment of PTSD, only recommendations[,]" and cites to the American Psychological Association ("APA") PTSD Guideline Development Panel's statement that "[g]uidelines differ from standards in that standards are mandatory[.]" Doc. 37-6, PageID 1010–11. But just because the APA does not specify a standard for PTSD treatment does not mean that there can be no standard of care established for such treatment based on the average degree of skill, care and diligence exercised by psychologists in similar situations.

9

should not have enrolled William in the Study because they "should have anticipated in 2016 the possibility that CPT could again be followed by suicidality in William []." Doc. 37-5, PageID 1006. She offers this critique based, in part, on her belief that:

> Psychotherapy should proceed on an individualized basis. The standardization of therapies was introduced in the '80s for testing their possible efficacy within the context of explanatory RCTs [randomized clinical trials]. In clinical reality, however, therapies do not need to be standardized and *should not be* standardized they *should be* tailored to the patient's particular needs and capacities. In addition, attention *should be* given to the possible and/or probable adverse effects induced by any given treatment in any given individual. Only in this fashion will clinicians meet the APA Standard of Care of 'Do non [sic] harm', above and beyond clinical guidelines.

Doc. 37-5, PageID 1008 (emphasis added). In both reports, she cites to various studies that question the efficacy of CPT or that challenge authorities that endorse CPT as a PTSD treatment. Docs. 37-5; 37-6.

Dr. Gaston's *subjective* beliefs fail to state the *objective* standard of care required by Ohio law. Although she acknowledges that other practitioners may take a different approach than her, her reports reflect that she considers her own beliefs to constitute "the" standard of care. Because Dr. Gaston believes that psychologists should disregard clinical guidelines when necessary to meet the APA's ethical principles, she concludes that CINVAMC should have disregarded the VA guidelines in their care of William. Further, she seems to "equate 'standard of care' with the highest, or virtually perfect, standard of care in a given situation, rather than the standard enunciated in *Bruni*, which is premised on what a medical professional of 'average' degree of skill, care and diligence in the same medical specialty would do in similar circumstances." *Harden v. Univ. of Cincinnati Med. Ctr.*, 2004-Ohio-5548, ¶ 31 (10th Dist.) (affirming trial court's disregard of expert testimony that referred to expert's own personal standard of care). Finally, Dr. Gaston's citations to various authorities that

suggest some disagreement in the literature as to the efficacy of CPT—although more objective than her other pronouncements—are nevertheless inadequate; she fails to establish that these authorities demonstrate what an average psychologist would do when confronted with a similar situation.

For further support that Dr. Gaston's standard of care is inappropriate, the Court notes that her standard—do no harm—presumes breach; William's harm *ipso facto* establishes CINVAMC's failure to avoid that harm. But Dr. Gaston's standard violates the general rule that "no presumption of negligence is indulged from the mere fact of injury[.]"[6] *Ault v. Hall*, 119 Ohio St. 422, 429 (1928).

Thus, Dr. Gaston's reports do not establish what a psychologist with an "average degree of skill, care and diligence" would have done in a similar situation. *Bruni*, 46 Ohio St. 2d at 130. If anything, her concession that the CINVAMC providers followed the VA guidelines in treating William with CPT suggests that CINVAMC *met* the applicable standard of care. Summary judgment is appropriate where the nonmovant fails to respond with proper evidence supporting the essential elements of their claim. *See Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St. 3d 266, 269 (1993).

Accordingly, because Dr. Gaston used her own set of personal beliefs and judgments and failed to observe the applicable standard of care when rendering an expert opinion related to the treatment William received at CINVAMC leading up to his tragic death, and in the absence of any other proof of medical malpractice, Defendant is entitled to summary

---

[6] The exception to this general rule is the doctrine of *res ipsa loquitor*, but Plaintiff does not argue for the application of that doctrine here. *See Ault*, 119 Ohio St. at 429.

judgment on Plaintiff's claim seeking to hold CINVAMC legally responsible under the FTCA.

The law in this instance offers little comfort to a grieving father in the face of the tragic loss of a son. It would be inhuman for any family to not want to experiment with every available psychological treatment in seeking care for a loved one suffering from the debilitating effects of mental illness if there is even the slightest chance it might save a life. No treatment that William might have received, however, could guarantee success. In other words, without more evidence, it is not enough to rely solely on one psychologist's opinion that had a different experimental treatment been used that might have increased William's chances of survival. Plaintiff's own expert, Dr. Gaston, acknowledges that CINVAMC followed "guidelines which are *based on research conclusions drawn by enthusiastic researchers*." Doc. 37-5, PageID 1002 (emphasis added). One can only assume that the medical providers who treated William at CINVAMC over a significant period and who got to know him relied on the community of medical research and prescribed, what in their best professional judgment, was a course of treatment that would resolve William's PTSD while also trying to keep him safe from self-harm through opioid abuse. Perhaps some solace can be drawn from the knowledge that the care William did receive from the medical professionals at CINVAMC was on the level with what "the relevant medical community" recommended and what William would have been prescribed by "members of the same medical specialty community in similar situations," had he gone instead to another hospital or medical facility in and around Ohio for help with his PTSD. *Bruni*, 46 Ohio St. 2d at 130.

## III. CONCLUSION

For the reasons stated, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 34) and **DENIES AS MOOT** Defendant's Motion to Exclude (Doc. 43). The Court **ORDERS** the clerk to **ENTER JUDGMENT** and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

November 4, 2025

Jeffery P. Hopkins
United States District Judge